[Cite as *State v. Kasler*, 2012-Ohio-6073.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | : | JUDGES: |
| STATE OF OHIO | : | W. Scott Gwin, P.J. |
| | : | John W. Wise, J. |
| Plaintiff-Appellee | : | Julie A. Edwards, J. |
| | : | |
| -vs- | : | Case No. 11-CA-59 |
| | : | |
| | : | |
| JOHNNIE KASLER | : | O P I N I O N |
| Defendant-Appellant | | |


CHARACTER OF PROCEEDING:          Criminal Appeal from Fairfield County
                                                          Court of Common Pleas Case No.
                                                          11-CR-404

JUDGMENT:                                       Affirmed

DATE OF JUDGMENT ENTRY:          December 20, 2012

APPEARANCES:

For Plaintiff-Appellee                      For Defendant-Appellant

GREGG MARX                               DAVID A. SAMS
Prosecuting Attorney                       P.O. Box 40
Fairfield County, Ohio                      West Jefferson, Ohio  43162

BY: JOSELYN S. KELLY
Assistant Prosecuting Attorney
239 W. Main Street, Suite 101
Lancaster, Ohio  43130

*Edwards, J.*

{¶1} Appellant, Johnnie Kasler, appeals a judgment of the Fairfield County Common Pleas Court convicting him of rape (R.C. 2907.02(A)(2)), attempted rape (R.C. 2923.02) and felonious assault (R.C. 2903.11). Appellee is the State of Ohio.

## STATEMENT OF FACTS AND CASE

{¶2} During the afternoon of April 12, 2008, C.B. went to Mulligan's, a bar in Lancaster, to have a drink with a former boyfriend. C.B. was living in Zanesville with her boyfriend, who was a long-distance truck driver, but returned to Lancaster at times to visit her grandchildren, hang out at Mulligan's, and attend Alcoholics Anonymous (AA) meetings. After a few hours, she took her friend to his home and returned to the bar alone. C.B. ran into appellant when she returned to the bar. She knew appellant from AA meetings and considered him to be a friend.

{¶3} C.B. spent three or four hours talking to appellant. She had between five and ten drinks, but because she was an alcoholic, she had a high tolerance for alcohol. She described her condition as "lit" but able to function. Appellant had spent the afternoon drinking 12 beers in the woods behind the Kroger's grocery store before riding his bicycle to Mulligan's. He had five more beers while talking to C.B. A patron of the bar observed C.B. fall to the floor several times while attempting to sit down. She also thought C.B. and appellant were married because appellant was wearing a wedding ring and he and C.B. were touching each other in the bar.

{¶4} Around midnight, C.B. decided to leave and go to a hotel because she did not want to drive back to Zanesville. Appellant offered to let her sleep on his couch rather than pay for a hotel. Appellant was having difficulties with his wife because he

was not working, and was staying in a garage/warehouse structure which belonged to a friend. C.B. accepted his offer but made it clear that nothing was going to happen between them.

{¶5} C.B. noticed that the place where appellant was staying was filled with junk and smelled like cats. She intended to sleep until she felt sober enough to drive home. Appellant instructed her to leave her cell phone near the entrance, and she complied. She complained of a headache, and appellant brought her a Tylenol and a Mountain Dew. She sat down on a couch, placing her inhaler and keys on the floor near her. She then went to sleep.

{¶6} C.B. awakened to find appellant, who was naked, on top of her. Her pants had been removed. She tried to push appellant off, telling him she could not breathe and was not going to do this. He got off and allowed her to use her inhaler to catch her breath, but appellant told C.B. he was going to finish what he started. She did not attempt to leave because she would have to pass appellant to exit the building, and appellant was sitting near an axe. Appellant was angry and repeated that he planned to finish what he started. When she repeatedly stated that she did not plan to have sex with him, appellant hit her and her face began to bleed.

{¶7} After hitting her, appellant said to C.B., "Suck my dick." Tr. 314. She refused. Appellant began masturbating and told her to "play with herself." Tr. 315. C.B. pretended to masturbate. At appellant's instruction, C.B. laid down and appellant got on top of her, covering her face with his shirt. Appellant put his penis in her vagina and began moving up and down. When he stopped, C.B. put her pants back on.

Appellant instructed her to go in the restroom and urinate, and she complied. He also told her not to look in the mirror.

{¶8}   When C.B. returned from the restroom, appellant told her she could not leave because he did not want to get in trouble.  She assured him that she would not tell anyone.  Eventually appellant calmed down and allowed her to leave, walking her to her car.

{¶9}   After leaving, C.B. saw the condition of her lip in the car mirror and realized she needed to go to the emergency room.  She stopped at Mulligan's to try to learn appellant's name.  The manager noted that she had blood all over her face and was "beat up."

{¶10} C.B. then went to the hospital, where she told the triage nurse that she had been raped.  C.B. agreed to go through a sexual assault exam.  Dr. Mark Darnell saw C.B. and noted that her lip was completely severed.  The inside, outside and muscular layers of the lip were all split.  He called in a plastic surgeon, something he had done only a handful of times in nineteen years of practice.  A plastic surgeon stitched her lip.  Her lips remains scarred and she has no feeling in a portion of her lip.

{¶11} Detective James Neader of the Lancaster Police Department met with C.B. after she was discharged from the hospital.  He noted that she was quiet and troubled and had a large cut to the upper right side of her lip.

{¶12} Detective Neader learned from the owner of the property where the incident occurred that appellant often stayed at the property.  Appellant voluntarily appeared at the police station on April 14, 2008.  He stated that he went to the garage with a woman he met at AA.  He told police that C.B. asked him to have sex.  He said,

"No problem, we can have sex." Tr. 530. He was "sort of" bothered by this because he is married, but "things happen when you're drinking." Tr. 530. C.B. kissed him in the car, and he kissed her back. He said that she tripped and fell when entering the garage, which may be where she split her lip. According to appellant the garage is dimly lit and there are a lot of cats in the building. He told police that they had vaginal sex which was over in a few minutes. He said the sex was consensual, and he walked her to her car afterwards.

{¶13} On April 8, 2011, appellant was indicted on four counts of rape and one count of attempt to commit rape. Appellant filed a motion to sever offenses. The motion was granted. He proceeded to trial on one count of rape and one count of attempted rape relating to C.B. On June 24, 2011, the trial court declared a mistrial because the jury was unable to reach a verdict.

{¶14} On September 2, 2011, appellant was indicted on one count of rape, one count of attempted rape and one count of felonious assault related to C.B. The State dismissed the corresponding counts in the previous indictment and proceeded to trial under the new indictment. Following jury trial, he was convicted on all counts. He was sentenced to nine years incarceration for rape, four years incarceration for attempted rape, and four years incarceration for felonious assault, to be served consecutively. He assigns the following errors on appeal:

{¶15} "I. THE DEFENDANT-APPELLANT WAS RETRIED IN VIOLATION OF OHIO'S SPEEDY TRIAL STATUTE AND OF HIS RIGHT TO A SPEEDY TRIAL IN VIOLATION OF THE STATE AND FEDERAL CONSTITUTIONS.

{¶16} "II. THE DEFENDANT-APPELLANT WAS RETRIED AND CONVICTED IN VIOLATION OF HIS RIGHT AGAINST DOUBLE JEOPARDY UNDER THE STATE AND FEDERAL CONSTITUTIONS.

{¶17} "III. THE DEFENDANT-APPELLANT WAS DENIED THE RIGHTS OF CONFRONTATION AND TO PRESENT A DEFENSE UNDER THE STATE/FEDERAL CONSTITUTIONS.

{¶18} "IV. THE DEFENDANT-APPELLANT WAS DENIED A FAIR TRIAL BY PROSECUTORIAL MISCONDUCT IN VIOLATION OF THE STATE AND FEDERAL CONSTITUTIONS.

{¶19} "V. THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO DUE PROCESS IN VIOLATION OF THE STATE AND FEDERAL CONSTITUTIONS.

{¶20} "VI. THE DEFENDANT-APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE STATE AND FEDERAL CONSTITUTIONS.

{¶21} "VII. THE TRIAL COURT ERRED WHEN IMPOSING CONSECUTIVE SENTENCES IN VIOLATION OF OHIO LAW AND THE STATE AND FEDERAL CONSTITUTIONS.

{¶22} "VIII. THE DEFENDANT-APPELLANT WAS DENIED DUE PROCESS BY CUMULATIVE ERROR IN VIOLATION OF OHIO LAW AND THE STATE AND FEDERAL."

I

{¶23} In his first assignment of error, appellant argues that the charge of felonious assault should have been dismissed because his speedy trial rights were violated.

{¶24} The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. Pursuant to these constitutional mandates, R.C. 2945.71 through R.C. 2945.73 prescribe specific time requirements within which the State must bring an accused to trial. *State v. Baker,* 78 Ohio St.3d 108, 110, 1997-Ohio-229, 676 N.E.2d 883. R.C. 2945.71 provides, in pertinent part:

{¶25} "(C) A person against whom a charge of felony is pending:

{¶26} "(2) Shall be brought to trial within two hundred seventy days after the person's arrest....

{¶27} "(E) For purposes of computing time under divisions (A), (B), (C)(2), and (D) of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days. This division does not apply for purposes of computing time under division (C)(1) of this section."

{¶28} However, the time limit can be tolled, or extended, pursuant to R.C. 2945.72, which states, in relevant part:

{¶29} "The time within which an accused must be brought to trial, * * * may be extended only by the following:

{¶30} "* * *(E) Any period of delay necessitated by reason of a .... motion, proceeding, or action made or instituted by the accused.

{¶31} "(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion."

{¶32} Speedy trial statutes are to be strictly construed against the State. *State v. Miller*, 113 Ohio App.3d 606, 681 N.E.2d 970(1996). In reviewing a speedy trial claim, an appellate court must count days chargeable to each side and determine whether the case was tried within the statutory time limits. *City of Oregon v. Kohne*, 117 Ohio App.3d 179, 690 N.E.2d 66 (1997).

{¶33} Appellant argues that because the felonious assault charges arose out of the same set of facts as the original rape and attempted rape charges, the time within which he should be brought to trial began to run with the original indictment.

{¶34} Subsequent charges made against an accused are subject to the same speedy-trial constraints as the original charges, if the additional charges arose from the same facts as the first indictment. *State v. Adams*, 43 Ohio St.3d 67, 68, 538 N.E.2d 1025, 1027 (1989). However, the state is not subject to the speedy-trial timetable of the initial indictment when additional criminal charges arise from facts different from the original charges, or the state did not know of these facts at the time of the initial indictment. *Baker*, *supra*, at syllabus.

{¶35} The State argues that it was not aware of the permanent damage to C.B.'s lip until 2011 when C.B. returned from Florida, where she had moved subsequent to the incident, to testify at the first trial, and thus could not have charged appellant with felonious assault in the original indictment.  Felonious assault is defined by R.C. 2903.11:

{¶36} "(A) No person shall knowingly do either of the following:

{¶37} "(1) Cause serious physical harm to another or to another's unborn;

{¶38} R.C. 2901.01 defines serious physical harm in pertinent part:

{¶39} "(5) 'Serious physical harm to persons' means any of the following:

{¶40} "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

{¶41} "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

{¶42} "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."

{¶43} The evidence presented at trial demonstrates that on the night of the rape, appellant punched C.B. in the lip when she refused to consent to sex with him. C.B. went to the hospital later that night to have her lip stitched. Dr. Mark Darnell saw C.B. and noted that her lip was completely severed. The inside, outside and muscular layers of the lip were all split. He called in a plastic surgeon, something he had done only a handful of times in nineteen years of practice. A plastic surgeon stitched her lip. When the police interviewed appellant several days after the incident, they showed him pictures of C.B.'s lip and he expressed shock at the severity of the injury. The incident occurred in April of 2008, but appellant was not indicted until three years later in April of 2011. Although the State may not have seen C.B. until she appeared for the first trial because she had moved to Florida, the State had access to information concerning the potential severity of the injury at the time it occurred and could have inquired of C.B.

about the lingering effects of the injury prior to her appearance at trial. We therefore find that for speedy trial purposes, the felonious assault charge dates back to the date of the original indictment.

{¶44} However, in calculating the time within which a criminal defendant must be brought to trial under R.C. 2945.71, periods of delay resulting from motions filed by the defendant in a previous case also apply in a subsequent case in which there are different charges based on the same underlying facts and circumstances of the previous case. *State v. Blackburn*, 118 Ohio St.3d 163, 887 N.E.2d 319, 2008-Ohio-1823, syllabus. We therefore must determine if the time was tolled in the proceedings under the first indictment, and whether appellant was brought to trial within 270 days as required by statute.

{¶45} Appellant was served with a warrant on the indictment on April 11, 2011. At that time, he was held in prison and so the triple count provision of R.C. 2945.71(E) applies. On April 13, 2011, he filed a motion for a bill of particulars and a discovery request. A demand for discovery or a bill of particulars is a tolling event pursuant to R.C. 2945.72(E). *State v. Brown*, 98 Ohio St.3d 121, 781 N.E.2d 159, 2002-Ohio-7040, syllabus. Because of the triple count provision, the two days that elapsed before the clock was tolled count as six days.

{¶46} On May 20, 2011, appellant filed a motion to sever the charges from the rape charges involving three other victims. This motion is another tolling event. The court granted the motion to sever the charges on June 17, 2011. At this point, appellant was no longer held in jail on solely the charges in the instant case as the charges were severed from the remaining charges. The triple count provision applies only when the

defendant is being held in jail solely on the pending charge. *State v. Sanchez,* 110 Ohio St.3d 274, 277, 853 N.E.2d 283, 2006-Ohio-4478. Thus, the triple-count provision does not apply when a defendant is being held in custody pursuant to other charges. *Id.* Therefore, once the instant charges in which C.B. was the victim were severed from the charges involving the other three victims, appellant was no longer held in jail solely on the instant charges and the triple count provision no longer applied.

{¶47} The speedy trial clock began to run again on June 17, 2011. Four days elapsed between the judgment granting the motion to sever and the start of appellant's first trial. At this point, a total of 10 days had elapsed of the 270 days in which the State must bring appellant to trial.

{¶48} Appellant's first trial resulted in a mistrial on June 24, 2011. Ordinarily, the interval between the declaration of a mistrial and a retrial does not count toward a defendant's statutory speedy trial time, as long as the defendant is retried within a reasonable time. *State v. Morris*, 2nd Dist. No. 19283, 2003-Ohio-1049, ¶17, citing *State v. Fanning*, 1 Ohio St. 3d 19, 437 N.E.2d 583 (1982). The holding in *Fanning* is in accord with the view that the statutory speedy trial requirements apply only until trial on the charges involved is commenced, and when that trial terminates in a mistrial the second trial is merely a continuation of the same trial proceeding. *Id.* However, only 82 days passed between the declaration of a mistrial on June 24, 2011 and the start of appellant's new trial on September 13, 2011, leaving only 92 days elapsed of the 270 days within which appellant had to be brought to trial even if the time following the mistrial is counted.

{¶49} The first assignment of error is overruled.

II

{¶50} In his second assignment of error, appellant argues that his retrial was barred by double jeopardy because the trial court prematurely discharged the jury in the first trial.  He also argues the trial court erred in failing to charge the jury according to *State v. Howard*, 42 Ohio St.3d 18 (1989), before finding the jury to be deadlocked.

{¶51}  When a judge discharges a jury on the grounds that the jury cannot reach a verdict, the Double Jeopardy Clause does not bar a new trial of the defendant. *Renico v. Lett*, 130 S.C.t 1855, 176 L.E.2d 678 (2010), citing *United States v. Perez*, 22 U.S. 579, 6 L.Ed. 165 (1824).  *In Renico*, the United States Supreme Court provided guidance for reviewing a decision of a trial court to declare a mistrial based on a hung jury:

{¶52} "In particular, '[t]he trial judge's decision to declare a mistrial when he considers the jury deadlocked is ... accorded great deference by a reviewing court.' *Washington,* 434 U.S., at 510, 98 S.Ct. 824. A 'mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict [has been] long considered the classic basis for a proper mistrial.' *Id.,* at 509, 98 S.Ct. 824; see also *Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963) (deadlocked jury is the 'classic example' of when the State may try the same defendant twice).

{¶53} "The reasons for 'allowing the trial judge to exercise broad discretion' are 'especially compelling' in cases involving a potentially deadlocked jury. *Washington,* 434 U.S., at 509, 98 S.Ct. 824. There, the justification for deference is that 'the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just

verdict if it continues to deliberate.' *Id.,* at 510, n. 28, 98 S.Ct. 824. In the absence of such deference, trial judges might otherwise 'employ coercive means to break the apparent deadlock,' thereby creating a 'significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors.' *Id.,* at 510, 509, 98 S.Ct. 824.

{¶54} "This is not to say that we grant *absolute* deference to trial judges in this context. *Perez* itself noted that the judge's exercise of discretion must be 'sound,' 9 *Wheat*, at 580, 6 L.Ed. 165, and we have made clear that '[i]f the record reveals that the trial judge has failed to exercise the "sound discretion"' entrusted to him, the reason for such deference by an appellate court disappears.' *Washington,* 434 U.S., at 510, n. 28, 98 S.Ct. 824. Thus 'if the trial judge acts for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling, close appellate scrutiny is appropriate.' *Ibid.* Similarly, 'if a trial judge acts irrationally or irresponsibly, ... his action cannot be condoned.' *Id.,* at 514, 98 S.Ct. 824 (citing *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), and *Somerville, supra,* at 469, 93 S.Ct. 1066).

{¶55} "We have expressly declined to require the 'mechanical application' of any 'rigid formula' when trial judges decide whether jury deadlock warrants a mistrial. *Wade v. Hunter,* 336 U.S. 684, 691, 690, 69 S.Ct. 834, 93 L.Ed. 974 (1949). We have also explicitly held that a trial judge declaring a mistrial is not required to make explicit findings of 'manifest necessity' nor to 'articulate on the record all the factors which informed the deliberate exercise of his discretion.' *Washington, supra,* at 517, 98 S.Ct. 824. And we have never required a trial judge, before declaring a mistrial based on jury

deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse. In 1981, then-Justice Rehnquist noted that this Court had never 'overturned a trial court's declaration of a mistrial after a jury was unable to reach a verdict on the ground that the "manifest necessity" standard had not been met.' *Winston v. Moore,* 452 U.S. 944, 947, 101 S.Ct. 3092, 69 L.Ed.2d 960 (opinion dissenting from denial of certiorari). The same remains true today, nearly 30 years later." *Id.* at 1863-64.

{¶56} In the instant case, the judgment entry declaring a mistrial notes that the jury deliberated for 8.5 hours.   After two days of testimony, the jury began deliberations around lunch time on June 24, 2011.   The jury asked if they could see a sweatshirt which had been admitted into evidence, which the court allowed them to view.  Tr. 545.  The jury returned a second time and asked if they could see a typed transcript of the interview with appellant.  The court denied this request.  Tr. 548-549.  The jury returned a third time with two questions.  The first question was whether they could come back the next day if they did not reach a verdict, and the court answered that yes, they could come back the next day.  Tr. 549.  The second question was how long they could stay that night.  The court responded that they could stay as long as they wanted to stay that night, and could return as early as 8:00 the next morning.  Tr. 549-550.  The jury returned later and indicated that they wanted to resume deliberations at 9:00 the next morning.

{¶57} On June 25, 2011, the jury informed the court that they were deadlocked. The court placed what transpired in response to this information on the record as follows:

{¶58} "The 12 jurors had posed a question to the Court approximately 20 minutes ago, 25 minutes ago.

{¶59} "And the question is: We cannot agree on a verdict. We are not getting any closer.

{¶60} "In response to that question, the Court prepared a document which includes a question, and it reads - - to return to the jurors. And the Court did have its Bailiff, Mr. Rispress, present this to the jury foreperson. And it was folded when it was presented. It was folded when it was returned to the Court.

{¶61} "It states - - after giving the case heading, it says: It is customary for the Court to inquire if there's a possibility of reaching an agreement within a reasonable time. The Court will, therefore, submit this question to the foreperson with the instruction that the answer be yes or no. Do not disclose any other information or indicate the status of your deliberations.

{¶62} "And the question is: Is there a possibility that after an additional period of time today, you may reach an agreement?

{¶63} "Then there's the word 'yes' with a line and then 'no' with a line.

{¶64} "There's a check in blue ink on the 'no' line next to the 'no.' And it is signed by Terry A. Hahn, Foreperson.

{¶65} "So since we're here in court, I know you signed this, Mr. Hahn, but I'll just ask again. Is there - - without disclosing the status of any deliberations or anything or

saying anything else, is there a possibility that after an additional period of time today, you, meaning the jury, may reach an agreement?

{¶66} "THE FOREPERSON: No." Tr. 553-554.

{¶67} Appellant argues that by using the word "today," the court did not determine if it was truly impossible for the jury to reach a verdict, and only determined that they could not reach a verdict that day. However, the jury had indicated earlier that they were not getting any closer to reaching a verdict. Appellant did not object to the declaration of the mistrial, nor did he object to the manner in which the trial court responded to the jury's inquiry regarding their inability to reach a decision. We cannot find that the trial court abused its discretion in finding the jury deadlocked.

{¶68} Appellant also argues that the court erred in failing to give the jury a supplemental instruction. In *Howard, supra*, the Ohio Supreme Court approved the following supplemental instruction to be given a jury that appears to be deadlocked before they resume deliberations:

{¶69} The principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to

believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors." 42 Ohio St.3d 18, at syllabus 2.

{¶70} Appellant failed to object to the manner in which the trial court instructed the jury, failed to request a *Howard* instruction, and failed to object to the declaration of the mistrial upon the court's determination that the jury was deadlocked. Because appellant failed to object to the manner in which the court instructed the jury and failed to request a *Howard* instruction, we must find plain error in order to reverse. In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978). Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at paragraph three of the syllabus. We cannot find on the state of this record that had the jury been read the *Howard* instruction and sent back to deliberate, they would have acquitted appellant.

{¶71} The second assignment of error is overruled.

III

{¶72} In his third assignment of error, appellant argues that he was denied the right to cross-examine Detective Neader, Dr. Darnell and the nurse who conducted the exam at the hospital. He also argues that the court erred in admitting the medical evidence through the testimony of the nurse when such records were prepared by others who did not testify.

{¶73} The trial court may, consistent with the Confrontation Clause, impose reasonable limits on cross-examination. See, *e.g., Delaware v. Fensterer* , 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 19 (1985); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Furthermore, the admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). A reviewing court must not disturb a trial court's evidentiary ruling unless the ruling is found to be an abuse of discretion. *Id.* An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶74} Appellant first argues that the court erred in sustaining the State's objection to his question on cross-examination of Detective Neader regarding whether appellant's hands, which had no injuries, would have had some injury if appellant punched the victim in the mouth hard enough to split her lip. Although the court initially sustained his objection, when the question was rephrased, Detective Neader did answer the question without objection:

{¶75} "Q. And if he had used his fist, his right fist, to strike C.B. with such force that it would split her lip open, would you expect to see something on his hands?

{¶76} "MS. SCHIFFEL: Objection. Lack of foundation.

{¶77} "THE COURT: Sustained.

{¶78} "Q. Were you surprised when you saw nothing on his hands?

{¶79} "A. A little surprised, yes.

{¶80} "Q. Why were you surprised?

{¶81} "A. Because sometimes, again, when you have a blunt force like that, sometimes you may expect to see an injury.  But it doesn't always happen."  Tr. 620.

{¶82} Therefore, appellant has not demonstrated that he was denied the right to cross-examine the detective on this issue.

{¶83} Next appellant argues he was denied the opportunity to cross examine Dr. Darnell concerning whether the type of injury C.B. suffered to her lip, without dental damage, was consistent with a fall as opposed to a punch.

{¶84} Specifically, the question posed to Dr. Darnell was whether the injury to her lip was "more of a tear as opposed to being caused by blunt trauma."  Tr. 679.  At the time, counsel for appellant was questioning the doctor from a document prepared by Dr. Lichten, the plastic surgeon.  Counsel asked Dr. Darnell what the phrase "through and through" laceration meant on Dr. Lichten's report.  He explained that a through and through laceration is if you cut the lip all the way up with a pair of scissors.  Tr. 679. Counsel then asked, "So more of a tear as opposed to being caused by blunt force trauma?"  Tr. 679.  No foundation had been laid as to whether Dr. Darnell was qualified to testify as to the cause of the specific injury, and he had not testified on direct that the

injury was caused by blunt force trauma as opposed to a fall. He testified on direct examination that a significant amount of force would be required to split the lip completely, but expressed no opinion as to what kind of force may or may not cause this type of split. The record does not reflect that Dr. Darnell was qualified to express an opinion on what kind of force may or may not cause an injury of this type, and the trial court did not err in sustaining an objection to this question.

{¶85} Appellant next argues that the court erred in sustaining the State's objection to his questioning of Rhonda Wells, the nurse who conducted the sexual assault examination at the hospital. Appellant asked Wells, "Other than the lip injury, did you have any physical findings, any evidence whatsoever to indicate that this was a sexual assault as opposed to consensual sex?" Tr. 739. The State objected on the basis that the question embraced the ultimate issue, and the objection was sustained.

{¶86} Wells had previously testified on direct examination that it is not necessarily common to find evidence of rape in a sexual assault examination, but she would find evidence of intercourse. Tr. 696. She also testified that other than the facial injury, she did not find any other signs of assault or any signs of injury. Tr. 705. Therefore, appellant cannot demonstrate any prejudice from the court sustaining the objection to his testimony because the information he sought to elicit was already in evidence from Wells' testimony on direct examination.

{¶87} Finally, appellant argues that the court erred in admitting into evidence the examination records prepared by Wells. He argues these notes are testimonial in nature and prepared by people who did not testify in violation of his right to confront witnesses. Appellant stipulated to the admission of this exhibit as a business record.

Tr. 681. Appellant is therefore bound as to all matters of fact and law concerned in the stipulation. *State v. Large*, 5th Dist. No. 2006CA00359, 2007-Ohio-4685, ¶55, citing *State v. Folk*, 74 Ohio App.3d 468, 471, 599 N.E.2d 334 (1991). "A party will not be permitted to take advantage of an error which he himself invited or induced the court to make." *Id.*, quoting *Lester v. Leuck*, 142 Ohio St. 91, 50 N.E.2d 145 (1943), paragraph one of the syllabus. Being invited error, appellant cannot now complain seeking to undo that error and any prejudice it may have caused him. *Id.*, citing *State v. Kniep*, 87 Ohio App.3d 681, 686, 622 N.E.2d 1138 (1993).

{¶88} The third assignment of error is overruled.

IV

{¶89} In his fourth assignment of error, appellant argues that the prosecutor committed misconduct in questioning of witnesses and in opening statement.

{¶90} The standard of review for prosecutorial misconduct is whether the comments and questions by the prosecution were improper and, if so, whether they prejudiced appellant's substantial rights. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Gapen,* 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶91} Appellant first argues that the prosecutor committed misconduct in questioning the defense witness, Tawny Mowery. On cross-examination, the

prosecutor asked Ms. Mowery why, when the prosecutor talked to her the week before, Mowery told the prosecutor that she did not remember anything from the night in question. Tr. 765. Mowery stated that she did not remember saying that to the prosecutor. Id. Appellant did not object.

{¶92} Evid. R. 613(A) provides that in examining a witness concerning a prior statement, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request shall be shown or disclosed to opposing counsel. Counsel for appellant did not pursue the issue of the prior statement made by the witness, and when Mowery denied making the statement, the prosecutor moved on. Nothing in the record suggests that the prosecutor asked the question without a good faith belief that Mowery had in fact made the statement. Further, the trial court instructed the jury at the end of the trial that the evidence does not include any statement of counsel made during the trial. The prosecutor did not commit misconduct in asking Ms. Mowery this question.

{¶93} Appellant next argues that in questioning the victim, the prosecutor attempted to downplay the amount of alcohol consumed by the victim, "when it was obvious she was intoxicated after consuming more strong drinks than she could remember over a roughly a 9-hour period." He argues that it is not reasonable to believe that C.B., "who could not remember over less than 3 months whether her pants were on or off when she awoke to being raped, would be able to accurately recall to the exact number the number of drinks she consumed on a night three years earlier." Brief of appellant, page 14. The prosecutor did not commit misconduct in questioning the victim as to how many drinks she remembered consuming and her personal feeling

about her level of intoxication. The determination as to whether she was able to remember accurately how much she had to drink or whether she was more intoxicated than she claimed to be is a credibility determination within the province of the jury.

{¶94} Appellant next argues that in opening statement, the prosecutor attempted to insinuate that the lack of blood at the crime scene was due to tampering by appellant, and also improperly stated that appellant confessed to punching the victim when appellant said he might have accidently hit her.

{¶95} The prosecutor stated as follows:

{¶96} "Detective Neader will tell you, that's when he began his investigation. Actually, it began before that, but this is when the action started coming together. He was able to make contact with the property owner of the garage. He also was able to put together a suspect. Then he went out and he examined the garage. However, when he examined the garage, it was much, much later, the evidence will show, than when C.B. left.

{¶97} "Detective Neader will tell you he collected evidence from the garage of what he believed was going to be evidence of the crime - - a comforter, a bed sheet and a washcloth. And he will tell you that that evidence he collected much, much later revealed no useful leads or evidence in this case.

{¶98} "Finally, ladies and gentlemen, on April 14th, 2008, Johnnie Kasler came to the Police Department and made a recorded interview with Detective Neader. And you will listen to that interview.

{¶99} "In that interview, he admits that he had sex with Carolyn, but he maintains that it was consensual. He also admits that he may have punched her. He may have punched her." Tr. 259-260.

{¶100} The evidence did in fact show that the evidence was collected at the crime scene later and that the detective visited the crime scene later. The prosecutor did not make any comments concerning tampering with the crime scene. Further, while appellant did not use the word "punch" in his statement to police, he did tell police that he might have hit her. The prosecutor's use of the word "punch" instead of "hit" is not such a distortion of appellant's statement as to constitute misconduct, as it is clear from the context of appellant's statement to the police that he understood the police were talking about hitting her in the mouth, causing the injury appellant observed on the photograph shown to him by police.

{¶101} Finally, appellant argues that the prosecutor committed misconduct in eliciting testimony from nurse Rhonda Wells which she later contradicted on cross-examination. On direct examination, the prosecutor asked Wells to review an exhibit, which was a medical record prepared by another person. When asked if the history as recounted in that exhibit was consistent with what C.B. told her at the emergency room, she responded that it was. On cross-examination, counsel pointed out the same section and asked where in the records prepared by the witness this information was located. Wells responded that she did not document that. When counsel asked her if Wells would have documented that if C.B. had told her, she responded, "Correct." Any inconsistency in Wells testimony goes to the weight and credibility of her testimony.

The inconsistency in her testimony is not attributable to any misconduct by the prosecutor.

{¶102} The fourth assignment of error is overruled.

V

{¶103} In his fifth assignment of error, appellant argues that the judgment is against the manifest weight of the evidence.

{¶104} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997–Ohio–52, 678 N.E.2d 541, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).

{¶105} Appellant was convicted of rape as defined by R.C. 2907.02(A)(2), which provides, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."  Appellant was also convicted of attempted rape.  R.C. 2923.02(A) defines attempt, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."  Finally, appellant was convicted of felonious assault, in violation of R.C. 2903.11(A)(1):

{¶106} "(A) No person shall knowingly do either of the following:

{¶107} "(1) Cause serious physical harm to another or to another's unborn[.]"

{¶108} C.B.'s testimony, if believed by the jury, was sufficient to convict appellant of all three offenses. She testified that appellant hit her, then told her to lay down. He covered her face with a shirt and engaged in vaginal intercourse with her against her consent. This is sufficient evidence to convict him of rape. She testified that after hitting her in the mouth, he instructed her, "Suck my dick." This is sufficient evidence to convict appellant of attempted rape. She also testified that he punched her in the mouth. The medical evidence demonstrated that he split her lip completely open, requiring closure by a plastic surgeon. C.B., as of the time of trial, still had a scar on her lip and no feeling in a portion of her lip. This evidence was sufficient, if believed by a jury, to convict appellant of felonious assault.

{¶109} Appellant argues that the victim cannot be believed because she was drunk on the night in question and could not remember what occurred. The only direct evidence as to what occurred between the parties at the time of the rape was C.B.'s testimony and appellant's statement to police that they did have sex, but it was consensual. The jury, who is in a better position than this court to judge the credibility of witnesses, did not believe appellant's statement. Further, appellant also had consumed a great deal of alcohol on the night in question.

{¶110} We cannot find that the jury lost its way in believing C.B.'s testimony. The judgment is not against the manifest weight of the evidence. The fifth assignment of error is overruled.

VI

{¶111} Appellant argues that counsel was ineffective for failing to move to dismiss the charges on the grounds of double jeopardy for the reasons argued in the second assignment of error.

{¶112} A properly licensed attorney is presumed competent. *State v. Hamblin,* 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). Therefore, in order to prevail on a claim of ineffective assistance of counsel, appellant must show counsel's performance fell below an objective standard of reasonable representation and but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). In other words, appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

{¶113} Based on our discussion of the second assignment of error, appellant cannot demonstrate that had counsel moved to dismiss the charges on double jeopardy grounds based on the trial court's decision to grant a mistrial in the first trial, the charges would have been dismissed.  The sixth assignment of error is overruled.

VII

{¶114} In his seventh assignment of error, appellant argues that the court erred in sentencing him consecutively because the offenses were allied offenses of similar import.

{¶115} R.C. 2941.25 reads as follows:

{¶116} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶117} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶118} In *State v. Rance,* 85 Ohio St.3d 632, 636, 1999–Ohio–291, 710 N.E.2d 699, the Ohio Supreme Court held that offenses are of similar import if the offenses "correspond to such a degree that the commission of one crime will result in the commission of the other." *Id.* The *Rance* court further held that courts should compare the statutory elements in the abstract. *Id.*

{¶119} In 2008, the Ohio Supreme Court instructed as follows in *State v. Cabrales,* 118 Ohio St.3d 54, 2008–Ohio–1625, 886 N.E.2d 181, paragraph one of the syllabus:

{¶120} "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), courts are required to compare the elements of offenses in the abstract without considering the evidence in the case, but are not required to find an exact alignment of the elements. Instead, if, in comparing the elements of the offenses in the abstract, the offenses are so similar that the commission of one offense will necessarily result in the commission of the other, then the offenses are allied offenses of similar import."

{¶121} According to *Cabrales,* if the sentencing court has initially determined that two crimes are allied offenses of similar import, the court then proceeds to the second part of the two-tiered test and determines whether the two crimes were committed separately or with a separate animus. *Id.* at 57, citing *State v. Blankenship,* 38 Ohio St.3d 116, 117, 526 N.E.2d 816 (1988).

{¶122} However, on December 29, 2010, the Ohio Supreme Court decided *State v. Johnson,* 128 Ohio St.3d 153, 2010–Ohio–6314, 942 N.E.2d 1061, which specifically overruled the 1999 *Rance* decision. The Court held: "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Id.,* at the syllabus.

{¶123} In the instant case, the facts establish that the offenses of felonious assault, attempted rape and rape were separate acts. Appellant first committed felonious assault by punching C.B., splitting open her lip. He then demanded oral sex from C.B. After C.B. refused to provide oral sex, appellant put his penis in her vagina against her will. The trial court did not err in finding that each of these acts was separate from the others, and the offenses were therefore not allied offenses of similar import.

{¶124} The seventh assignment of error is overruled.

VIII

{¶125} In his final assignment of error, appellant argues that he was denied a fair trial by the cumulative effect of the errors raised in assignments of error one through seven.

{¶126} Although violations of the Rules of Evidence during trial may singularly not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprived the defendant of the constitutional right to a fair trial. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), ¶ 2 of the syllabus. The *DeMarco* case involved numerous violations of the hearsay rule, which the Supreme Court found cumulatively, resulted in prejudicial error. *Id.* at 196–197, 509 N.E.2d 1256. However, the doctrine is not applicable to cases where the court has not found multiple instances of harmless error. *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623, 1995–Ohio–168.

{¶127} In the instant case, we have not found multiple instances of harmless error. The doctrine of cumulative error therefore does not apply. The eighth assignment of error is overruled.

{¶128} The judgment of the Fairfield County Common Pleas Court is affirmed.

By: Edwards, J.

Gwin, P.J. and

Wise, J. concur

_____

_____

_____

JUDGES

JAE/r1105

[Cite as *State v. Kasler*, 2012-Ohio-6073.]

IN THE COURT OF APPEALS FOR FAIRFIELD COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| JOHNNIE KASLER | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 11-CA-59 |

For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Fairfield County Court of Common Pleas is affirmed.  Costs assessed to appellant.

_____

_____

_____

JUDGES