[Cite as *State v. Parker*, 2020-Ohio-4607.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                              Court of Appeals No. L-18-1238

     Appellee                                          Trial Court No. CR0201802263

v.

 Christopher R. Parker                           **DECISION AND JUDGMENT**

     Appellant                                         Decided:  September 25, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Eric Allen Marks, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Christopher Parker, appeals the October 31, 2018 judgment of the Lucas County Court of Common Pleas sentencing him to an aggregate prison term of 16 years.  For the following reasons, we affirm.

## I.  Background and Facts

{¶ 2} This case arose from two separate assaults that Parker committed against the victim, J.P., which generated five separate court cases.

### A.  Municipal court case No. CRA-17-12437

{¶ 3} The first assault occurred on October 7, 2017.[1]  According to the complaint filed in Toledo Municipal Court case No. CRA-17-12437 ("case 1") by Toledo Police Department ("TPD") Detective Alexander Schaller, J.P. said that Parker, her live-in boyfriend, "assaulted her by punching her at least three times in the face with a closed fist."  The complaint also said that J.P. was admitted to the hospital "due to bleeding on her brain and swelling."  The complaint charged Parker with felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony.

{¶ 4} Parker was arrested on October 11, 2017, and held in jail until case 1 was dismissed on October 23, 2017.

{¶ 5} The case was scheduled for a preliminary hearing on October 19, 2017.  J.P. failed to appear, so the municipal court continued the hearing, at the state's request, until October 23, 2017.

---

[1] The complaint lists the date of the assault as "on or about October 06, 2017."  For clarity and continuity, we will refer to the date of the first assault as October 7, which is the date used in the indictments in the common pleas court cases.

2.

{¶ 6} On October 23, J.P. again failed to appear for the preliminary hearing, so the state requested that the municipal court dismiss the case. The court granted the state's request.

### B. Municipal court case No. CRA-18-03557

{¶ 7} The second assault occurred on March 25, 2018. According to the complaint that Schaller filed in Toledo Municipal Court case No. CRA-18-03557 ("case 2"), J.P. said that Parker "assaulted her by grabbing her around the neck with his hands and strangled her" and "stated, 'you're going to die bitch" [sic] as he was strangling her." The complaint charged Parker with domestic violence in violation of R.C. 2919.15(A), a fourth-degree felony.

{¶ 8} On April 16, 2018, Parker was arrested and held in jail in lieu of bail— where he remained until his trial in the underlying case (i.e., "case 5") on October 9, 2018.

{¶ 9} Case 2 was scheduled for a preliminary hearing on April 24, 2018. J.P. failed to appear for the preliminary hearing, so the municipal court continued the hearing, at the state's request, until April 25, 2018.

{¶ 10} On April 25, the state requested that the municipal court dismiss the case because the grand jury had indicted Parker. The court granted the state's request.

### C. Common pleas court case No. CR0201801734

{¶ 11} On April 24, 2018, Parker was indicted in common pleas court case No. CR0201801734 ("case 3") on one count of domestic violence in violation of R.C. 2919.25(A), a fourth-degree felony, related to the March 25, 2018 assault on J.P.

{¶ 12} Following Parker's April 30, 2018 arraignment, the parties engaged in discovery and attended two pretrials. The trial court initially set a jury trial for June 12, 2018, but continued the trial to July 17, 2018, at the state's request. On July 17, prior to the start of the trial, the state requested that the court dismiss case 3. The court granted the state's request.

{¶ 13} Parker continued to be held in jail in lieu of bail while case 3 was pending.

### D. Common pleas court case No. CR0201802234

{¶ 14} On July 6, 2018, Parker was indicted in common pleas court case No. CR0201802234 ("case 4") on two counts of felonious assault in violation of R.C. 2903.11(A)(1), both second-degree felonies, and two counts of domestic violence in violation of R.C. 2919.25(A), both fourth-degree felonies. One count of felonious assault and one count of domestic violence related to the October 7, 2017 assault against J.P., and the other counts of felonious assault and domestic violence related to the March 25, 2018 assault against J.P.

{¶ 15} Nothing of note happened in this case before the state requested on July 17, 2018, that the court dismiss it. The court granted the state's request.

{¶ 16} Parker continued to be held in jail in lieu of bail while case 4 was pending.

4.

### E. The underlying case—common pleas court case No. CR0201802263

{¶ 17} On July 11, 2018, Parker was indicted in common pleas court case No. CR0201802263 ("case 5") on two counts of felonious assault in violation of R.C. 2903.11(A)(1), both second-degree felonies, and two counts of domestic violence in violation of R.C. 2919.25(A), both third-degree felonies. One count of felonious assault and one count of domestic violence related to the October 7, 2017 assault against J.P., and the other counts of felonious assault and domestic violence related to the March 25, 2018 assault against J.P.

{¶ 18} Parker continued to be held in jail in lieu of bail.

### 1. Parker's motion to dismiss

{¶ 19} On August 20, 2018, Parker filed a motion to dismiss case 5 based on a violation of his right to a speedy trial. He argued that he was incarcerated during the pendency of the proceedings and the triple-count provision in R.C. 2945.71(E) applied, so the state was required to bring him to trial within 90 days. However, a total of at least 98 days had passed since his arrest for the March 25 assault. The state responded that Parker was not entitled to the triple-count provision because he had been indicted on new charges that did not arise from the original indictment. By the state's calculation, only 203 of 270 days had passed, so it was within the statutory speedy-trial limit.

{¶ 20} On October 2, 2018, the trial court held a hearing on Parker's motion to dismiss. At the hearing, Parker clarified that he believed that the case was over time because the state knew about the October 7 assault before filing the charges in case 5, so

5.

speedy-trial time was counted beginning with case 1—which put the case far beyond the 270-day limit. The state responded that the indictment in case 5 was based on new and additional information that the state had no knowledge of at the time case 1 was filed. Specifically, the state alleged that Parker "called the victim subsequent or in kind of immediate response to that October criminal filing to get her not to come to court, * * *" which the state discovered while preparing to indict Parker for the March 25 assault. In the state's estimation, it was "not constrained by the speedy trial clock associated with the original indictment * * *" because of Parker's "conduct that prevented the victim from participating in the October incident's prosecution."

{¶ 21} The state also claimed that it was initially unaware of two prior domestic-violence convictions that elevated the domestic-violence charges against Parker to third-degree felonies. In support of this argument, it noted that the municipal court's online case search showed that a 2006 domestic-violence case against Parker was still pending and it was apparently not until later that someone from the prosecutor's office looked at the docket sheet for the 2006 case and saw that the municipal court had sentenced Parker on July 27, 2006, and the case was, in fact, closed.

{¶ 22} After hearing from the parties, the trial court denied Parker's motion to dismiss. It found that the indictment in case 5 involved charges that arose from the October 7 assault, which was separate from the incident for which Parker was already being held at the time the case 5 indictment was filed—the March 25 assault—so the triple-count provision of R.C. 2945.71 no longer applied beginning on July 11, 2018, the

6.

date case 5 was filed. On that basis, the court found that Parker failed to make a prima facie showing that the state violated his speedy-trial rights and that "the state is well within that 270 days." Accordingly, the trial court denied Parker's motion.

{¶ 23} Parker renewed his motion to dismiss on the morning of trial, but the trial court again denied it.

## 2. The state's motion for forfeiture by wrongdoing

{¶ 24} On August 9, 2018, the state filed a motion for forfeiture by wrongdoing. In the motion, the state asked the court to find that J.P. was unavailable for trial under the exception to the hearsay rule in Evid.R. 804(B)(6) so that the state could admit "all statements [J.P.] made to law enforcement officers and medical personnel involved in this case." The trial court heard testimony and arguments on the motion for forfeiture by wrongdoing during the October 2, 2018 hearing.

{¶ 25} According to the state, J.P. was refusing to communicate with prosecutors, had failed to appear for several court dates, and had sent a letter to the prosecutors claiming that Parker was innocent of the charges against him. The state believed that J.P.'s refusal to cooperate was the result of almost 1,600 phone calls that Parker made to J.P. while he was in jail—despite a no-contact order that prohibited Parker from having any contact with J.P.

{¶ 26} In support of its motion, the state presented the testimony of Detective Alexander Schaller. He was the officer who investigated both the October 7 and March 25 assaults against J.P. According to Schaller, he spoke with J.P. while she was at

7.

the emergency room immediately following the October 7 assault, and she wanted to proceed with prosecuting the case against Parker. After Parker was arrested, J.P. did not respond to Schaller's calls and did not appear for hearings at the municipal court, so the case was dismissed.

{¶ 27} Schaller also spoke to J.P. on the phone in the day or two following the March 25 assault to find out what she wanted to do about prosecuting that case. She wanted to go forward with pressing charges. Schaller asked J.P. why she did not come to the court hearings in case 1 and, according to Schaller, J.P. said "she was told not to come in and the charges would be dismissed and she was dissuaded from prosecuting" case 1. J.P. said that Parker's attorney was the one who told her not to come to court. Schaller did not have any communications with J.P. after this phone conversation.

{¶ 28} Additionally, Schaller testified to his unsuccessful attempts to communicate with J.P. He said that the prosecutor's office asked him to contact J.P. because she had not come to any pretrials. Schaller requested a subpoena for J.P.'s appearance at the August 20 jury trial date in case 5, which the prosecutor's office provided. He had another officer serve the subpoena because he was on vacation, but he believed that the other officer had successfully personally served J.P. Schaller also tried calling J.P. and leaving messages "at almost every phone number that [he] found available to her from her old reports and current stuff," but she did not answer the calls or respond to the messages. Schaller also tried to reach J.P. through her mother and brother, but was again unsuccessful.

8.

{¶ 29} Additionally, Schaller said that he believed J.P. had been personally served with a subpoena for the jury trial in case 5 that was originally scheduled to begin that day, but so far—approximately two hours after court began—Schaller had not seen J.P. at the courthouse. On cross, however, he admitted that he had not given J.P. a subpoena for that day—October 2, 2018—and did not know for sure that someone else had given her a subpoena.

{¶ 30} In addition to Schaller's testimony, the state submitted recordings of four phone calls that Parker made to J.P. while he was in the Lucas County jail. In the calls, Parker repeatedly urged J.P. to get the charges against him dismissed. For example, in the first phone call, made while Parker was in jail following the October 7 assault, Parker said that he was not "trying to sit in here and wait" and "that's not the thing we trying to do. We not trying to get me comfortable." When J.P. asked Parker what he "advise[d]" that she do, he responded "You gonna [sic] have to figure out something. * * * We already talked about it. But there's, like, there's something you've gotta do, like, to get the felony gone." In response, J.P. asked Parker what "exactly I am supposed to do" and said that she intended to give Parker's lawyer a statement and reach out to the detective to tell him that she did not want to press charges. Parker told J.P. to "go and look decent" and talk to a prosecutor to "shut that shit down" by telling the prosecutor that she would not come to court or proceed with the case and was not "trying to do all that." The state outlined similar conversations in the three other recorded calls, including explicit

9.

instructions from Parker to J.P. in April 2018 to write an affidavit explaining how she was misled and charges were pursued against her wishes.

{¶ 31} In response, Parker argued that the state had not proven that it issued J.P. a subpoena for the October 2 trial date or had attempted to serve J.P. with any subpoenas. He also said that the state failed to show that it had made any attempts at in-person contact with J.P., as opposed to simply calling her. And Parker argued that the other person on the recorded phone call was never identified, so there was no way to tell that it was actually J.P.

{¶ 32} After Parker's attorney pointed out that the state had not shown that it subpoenaed J.P. for October 2, the state admitted that, although it subpoenaed her for the earlier trial date, it inadvertently left her off of the subpoena list for the October 2 trial. As a result, it had not prepared or attempted to serve her with a subpoena for that day. To rectify this mistake, Schaller and two other TPD officers attempted to serve J.P. with a subpoena while the court took a recess to listen to the recorded phone calls, but she was not home. Schaller left the subpoena, his phone number, and the prosecutor's phone number with J.P.'s stepfather, who said that she would be home soon, and asked that J.P. contact him or the prosecutor as soon as she returned. Because the state now knew that it had a good address for J.P., the state asked the court to continue the trial so that it could serve J.P. with a subpoena. The state explained that J.P. had failed to appear in response to two subpoenas, failed to appear for pretrial witness meetings in response to at least two witness letters sent by the prosecutor's office, and failed to respond to "numerous

10.

attempts to contact the victim as well as her family by phone * * *." The state also noted that J.P. "has made her feelings known about this prosecution through the letter to the court in which she says very clearly that she does not wish to proceed with these charges [and] in her second letter that the defendant is innocent of all charges and that she would not be here to testify." The trial court granted the state a one-day continuance over Parker's objection.

{¶ 33} The next day, the trial court resumed its hearing on the state's motion for forfeiture by wrongdoing. The original trial judge was ill, but rather than continue the matter, Parker elected to have another judge preside over the second day of the hearing.

{¶ 34} First, the state recalled Schaller to testify about his contact with J.P. on October 2. During the court's recess, Schaller explained, he and two other officers went to an address that Schaller had for J.P. to attempt to serve her with a subpoena for the jury trial scheduled to begin that afternoon. Schaller spoke to J.P.'s stepfather and explained the circumstances to him. The stepfather told Schaller that J.P. had gone to the store and he was unsure when she would be home. Schaller and the officers waited for "a few minutes," and when they left, Schaller left his phone number "with hopes [J.P.] would contact us or appear."

{¶ 35} Later, as Schaller was leaving the courthouse for the day, he found that he had a voicemail from J.P. in which she "vehemently stated she didn't appreciate me coming to her house and threatening to arrest her, which no threats of arrest were made. She stated that she did not want to be involved in this case and was not going to

cooperate * * *." Schaller went back into the courthouse to the prosecutor's office to share the message with them. As he was leaving again, J.P. appeared at the prosecutor's office, so he was called back to serve her with the subpoena for October 3.

{¶ 36} When he served J.P., Schaller told her that the subpoena required her to be in court the next day. J.P. told Schaller that she did not want to be involved in the case because of stressors in her personal life. But she also said that she was afraid of Parker and "[t]hat he blames her for what happened and it's her fault and she shouldn't proceed." And she admitted that she continued to have phone conversations with Parker from the jail, including conversations on October 2. Schaller did not try to contact J.P. on October 3.

{¶ 37} The state also called Limie Stanton, J.P.'s mother. Stanton was not home when Schaller came to the house on October 2, but after speaking to her husband—J.P.'s stepfather—she called J.P. to encourage her to contact Schaller and the prosecutor. According to Stanton, J.P. said that she did not want to be a part of the trial because she was afraid that Parker's family members would blame her "if anything were to happen" and his family members were threatening her. J.P. also said that she did not want to relive everything that happened between her and Parker.

{¶ 38} Regarding the October 7 assault, Stanton said that J.P. told her that J.P. maintained contact with Parker while he was in jail because Parker threatened to "send someone by the house to look for" J.P. if she did not take his calls. Stanton said that J.P.

12.

seemed afraid of Parker and the threats he made, which is why J.P. did not go forward with the prosecution of the October 7 assault.

{¶ 39} After hearing the testimony, the trial court issued a preliminary ruling granting the state's motion for forfeiture by wrongdoing. Specifically, the court's ruling allowed the state to introduce J.P.'s hearsay statements regarding the identity of her assailant that were captured on the responding officers' body cameras after the October 7 and March 25 assaults and her hearsay statements to Schaller shortly after each assault regarding the identity of the assailant and her desire to press charges.

{¶ 40} Although the court intended to hold Parker's jury trial immediately following the hearing on October 3, 2018, because the trial judge was ill, the trial was continued until October 9, 2018. The morning of the trial, the court revisited the issue of J.P.'s unavailability under Evid.R. 804(B)(6).

{¶ 41} The state had Schaller testify about his efforts to contact J.P. between October 2 and October 9. First, he rehashed the events of October 2 that he testified to during the hearing on October 3. In doing so, he elaborated on his conversation with J.P. after serving her with the subpoena for the October 3 trial date. According to Schaller, J.P. reiterated that she did not want to be involved with this case and told Schaller that he did not "understand the psychology of it." She also said that she had been receiving phone calls from Parker telling her not to come to court and had spoken to Parker that day. Schaller said that he "explained to [J.P.] that I can't tell her not to come to court, she's under subpoena to come to court. And that yes, I did—no, I did not tell her family

13.

that I was going to arrest her when I was out at the house, but yes, she could be arrested or we could get a material witness order and she could be arrested for not honoring a subpoena. It's a court order." However, Schaller said that J.P. "basically didn't care what [he] was saying."

{¶ 42} Schaller said that on October 3, he was in the courtroom for the hearing in this case, but he did not see J.P. That night, when Schaller started his shift at 11:30 p.m., he and two other TPD officers went to J.P.'s home to attempt to serve her with a subpoena for the October 9 jury trial. J.P. was not home, so Schaller left a copy of the subpoena with Stanton, J.P.'s mother. In speaking with Stanton while trying to serve the October 9 subpoena, Schaller learned that J.P. was living there, but she had not returned to the house in three days in an attempt to avoid contact with the police. Schaller did not have any interactions with J.P. after their conversation on October 2. He confirmed on cross-examination that the only attempt he made to serve J.P. with a subpoena for the October 9 trial date was at 11:30 p.m. on October 3 and that he did not go to J.P.'s home any other times between October 3 and 9.

{¶ 43} During Schaller's testimony, the state introduced a letter that J.P. sent to the prosecutor and the court after the October 2 hearing. In it, she reiterated that she did not want to be involved in the case because of stressors in her personal life, not because she was afraid of Parker or his family. She claimed that she told Parker that she wanted to be in a relationship with him during their phone calls to "keep him from being emotional."

14.

{¶ 44} Next, the state asked Schaller about the conversations he had with J.P. following each assault. Schaller spoke with J.P. approximately one and one-half to two hours after the October 7 assault, while she was being treated in the emergency room. Stanton was in the room when Schaller spoke to J.P., and medical providers were in and out of the room while providing treatment. Schaller said that the side of J.P.'s face was swollen and someone from the hospital told him that she was being admitted to the intensive care unit because she had a "brain bleed." Schaller described J.P. as "upset, crying, concerned about what was going on and what happened." When Schaller asked J.P. what happened, she said that she and Parker "had gotten in to [sic] an argument and he had punched her several times in the face and head causing the swelling * * *. * * * She said at that time she wished to proceed with charges."

{¶ 45} Following the March 25 assault, Schaller briefly spoke to J.P. on the phone. He said that the assault happened at approximately 1:30 a.m. on March 25, and he spoke to J.P. "the same night." On cross, Schaller admitted that he did not know how long after the assault he spoke to J.P., but knew it was not "immediately" after because he was working on another case. The conversation lasted approximately "four to five minutes," and Schaller described J.P. as "still upset" and "mad." When Schaller asked her what happened, J.P. said that Parker "choked" her and that she woke in her own urine. Schaller asked J.P. "what did she want to do with this and she said she wanted to proceed with criminal charges." He also asked her why she had not pursued prosecution of the October 7 assault. According to Schaller, J.P. said that "she was approached by the

15.

defense attorney at the time and was requested to fill out a form stating it did not occur and that she had written a letter."

{¶ 46} Following Schaller's testimony on October 9, the trial court reaffirmed its earlier finding that J.P. was unavailable, Parker's wrongdoing caused J.P.'s unavailability, and Parker intended his wrongdoing to prevent J.P. from testifying in court. The court also found that Parker had adequate notice of the particular hearsay statements that the state planned to introduce. The court analyzed the credibility of the hearsay statements in light of the circumstances in which they were made and found them credible and admissible under Evid.R. 804(B)(6).

### 3. The jury trial

{¶ 47} The jury trial began after the forfeiture by wrongdoing hearing on October 9, 2018. On the morning of the third day of trial, a court security officer reported to the court an incident that happened as the jurors were leaving the night before. As the court summarized it:

> [Y]esterday when jurors were leaving, court security was escorting them on the private elevator. One of the—I think Juror Number 1 inquired as to whether or not that was the prisoner elevator. Court security said, yes, this is the prisoner elevator. And she stated, well, I think the defendant must be in custody then because he comes from the back. * * *
>
>     * * *

Then another juror piped in and said that's not something we can

talk about[.]

* * *

And the conversation ended there[.]

The court noted that the jurors never saw Parker entering or leaving the courtroom, but speculated that "[m]aybe they saw him going to the bathroom or something * * *." Regardless, Parker was never handcuffed or shackled when he used the restroom during trial.

{¶ 48} Parker's attorney moved for a mistrial. He argued that it was imperative that the jurors not think that Parker was in custody, but "unfortunately 14 people heard that and they're not going to be able to excise that out of their mind." The trial court declined to rule on the motion immediately. Instead, it opted to individually voir dire the jurors about what they heard in the elevator the night before.

{¶ 49} The court first spoke to juror 1. Juror 1 denied asking if they were in the prisoner elevator, but said that she asked if Parker was in custody, and someone replied that the jurors were not supposed to discuss that. Juror 1 said that she could be a fair and impartial juror in the case.

{¶ 50} When juror 1 left the chambers, the court security officer clarified that juror 1 was not the person who asked the initial question about whether the jurors were using the prisoner elevator. The security officer said that a different juror "from the back"— whom he could not identify—asked the question; juror 1 "followed up with what [the

security officer] heard and understood to be, well he must be in custody because he comes from the back."

{¶ 51} Based on the security officer's explanation, the court brought juror 1 back into chambers. When asked by Parker's attorney if she said that Parker "must be in custody because he comes from the back[,]" juror 1 replied "I might have said that, I don't remember." The court also tried to determine what juror 1 might have meant by saying "from the back," and juror 1 agreed with the court that she meant the back of the courtroom.

{¶ 52} When juror 1 left the chambers for the second time, the prosecutor told the court that any issues about Parker's custody status were likely moot because the state intended to introduce evidence of Parker's recorded jail phone calls to J.P. during trial that day.

{¶ 53} The court then called each of the remaining jurors and the two alternates into chambers for individual voir dire about whether they recalled the comments made in the elevator the night before. If the juror recalled the comments, the court asked if the juror understood that Parker's custody status had no bearing on the determination he or she needed to make in the case and did not change the state's burden of proving Parker's guilt beyond a reasonable doubt. The court also asked if the comments affected the juror's ability to remain fair and impartial. The court also gave the attorneys an opportunity to question each juror. All but one of the jurors recalled something about the

18.

comments made in the elevator, but each understood their responsibility and the state's burden and said that the comments did not affect their ability to remain fair and impartial.

{¶ 54} Following the individual voir dire, Parker's attorney again moved for a mistrial on the grounds that the jurors thinking Parker was in custody violated his due process rights. The state responded that a mistrial was only necessary if a fair trial was no longer possible, and nothing the jurors said during individual voir dire indicated that Parker could no longer get a fair trial. The trial court agreed with the state and denied Parker's motion.

{¶ 55} At the conclusion of the trial, the jury found Parker guilty of all four charges.

### 4. Sentencing

{¶ 56} At sentencing, the trial court merged the count of felonious assault related to the October 7 assault with the count of domestic violence related to the October 7 assault and merged the count of felonious assault related to the March 25 assault with the count of domestic violence related to the March 25 assault. The state chose to proceed on the felonious assault charges. The court sentenced Parker to 8 years on each count and ordered the sentences to be served consecutively for an aggregate prison sentence of 16 years.

{¶ 57} Parker appeals his convictions, raising three assignments of error:

FIRST ASSIGNMENT OF ERROR[:] THE LOWER COURT ERRED IN DENYING APPELLANT'S MOTION TO DISMISS FOR VIOLATIONS OF HIS RIGHT TO SPEEDY TRIAL[.]

SECOND ASSIGNMENT OF ERROR[:] THE TRIAL COURT ERRED BY GRANTING THE STATE'S MOTION FOR FORFEITURE BY WRONGDOING[.]

THIRD ASSIGNMENT OF ERROR[:] THE TRIAL COURT ERRED IN DENYING APPELLANTS [sic] REQUEST FOR A DECLARATION OF A MISTRIAL[.]

## II. Law and Analysis

### A. Parker's right to a speedy trial was not violated.

{¶ 58} In his first assignment of error, Parker argues that the trial court erred by denying his motion to dismiss based on the violation of his statutory right to a speedy trial.[2] First, he contends that the trial court improperly placed the burden of proving a speedy-trial violation on him instead of placing the burden on the state to prove that it brought him to trial within the statutory time limit in R.C. 2945.71(C)(2). Next, he argues that the state did not meet its burden of proving that a sufficient number of days were tolled to bring the state within the statutory time limit. And finally, Parker argues

---

[2] Parker does not raise any arguments regarding his constitutional right to a speedy trial.

20.

that the trial court failed to apply the triple-count provision of R.C. 2945.71(E) after July 11, 2018—the day he was indicted in case 5—and when the triple-count provision is properly applied, the state brought him to trial out of time.

{¶ 59} The state responds that the trial court properly denied Parker's motion because he failed to meet his initial burden of making a prima facie showing that the state brought him to trial outside of the statutory limit in R.C. 2945.71(C)(2). And, assuming that Parker met his burden, the state argues that a sufficient number of days were tolled to bring Parker's trial date within the statutory limit.

### 1. Statutory speedy trial rules.

{¶ 60} The right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10, of the Ohio Constitution. *State v. Adams*, 43 Ohio St.3d 67, 68, 538 N.E.2d 1025 (1989). The Ohio legislature adopted the provisions of R.C. 2945.71 to .73 to implement these constitutional guarantees. *Id.*

{¶ 61} Under the statutory scheme, the state is required to bring a defendant charged with a felony to trial within 270 days after his arrest. R.C. 2945.71(C)(2). The statute is mandatory, and the state must strictly comply with its requirements. *State v. Hohenberger*, 189 Ohio App.3d 346, 2010-Ohio-4053, 938 N.E.2d 419, ¶ 35 (6th Dist.). For calculation purposes, speedy-trial time begins running the day after the defendant's arrest. *State v. Taylor*, 6th Dist. Lucas No. L-98-1375, 2001 WL 1198648, *4 (Oct. 5, 2001). When the defendant is held in custody in lieu of bail, each day he is held counts

as three days for speedy-trial purposes. R.C. 2945.71(E). However, the triple-count provision of R.C. 2945.71(E) applies only when the defendant is "held in jail solely on the pending charge." *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, ¶ 7.

{¶ 62} If the defendant makes a prima facie showing that his speedy-trial time has elapsed, the burden shifts to the state to demonstrate that the defendant was timely brought to trial. *Taylor* at *2. If the state fails to do so, upon motion by the defendant at or before the commencement of trial, the trial court is required to dismiss the charges against the defendant. R.C. 2945.73(B).

{¶ 63} Under R.C. 2945.72, certain events can extend the time for trial (i.e., toll speedy-trial time). The exceptions in the statute are the only reasons that speedy-trial time can be extended. *Id.* ("The time within which an accused must be brought to trial * * * may be extended *only* by the following * * *.") (Emphasis added.)). Any extension must be strictly construed against the state. *City of Toledo v. Sklarov*, 6th Dist. Lucas Nos. L-15-1303 and L-15-1304, 2017-Ohio-137, ¶ 7. Two exceptions are most relevant here. Under R.C. 2945.72(E), when the defendant files a motion, time is tolled for a "reasonable time until the motion is responded to and ruled upon." *Sanchez* at ¶ 26. To determine a "reasonable" tolling period incurred by a defendant's motion, we consider the particular circumstances of the case, the complexity of the facts and difficulty of the legal issue involved, and the time constraints on the trial court. *State v. Crawford*, 6th Dist. Lucas No. L-17-1297, 2019-Ohio-2660, ¶ 31, citing *State v. Arrizola*, 79 Ohio

22.

App.3d 72, 76, 606 N.E.2d 1020 (3d Dist.1992). And under R.C. 2945.72(H), time is tolled during any continuance requested by the defendant.

{¶ 64} A trial court's decision denying a motion to dismiss based on an alleged violation of the speedy-trial statutes presents a mixed question of law and fact. *State v. Rumer*, 6th Dist. Lucas No. L-07-1178, 2009-Ohio-265, ¶ 7. While we accord reasonable deference to the trial court's findings of fact if supported by competent, credible evidence, we independently determine whether the trial court properly applied the law to the facts of the case. *Id.*

{¶ 65} "At its most basic, a speedy-trial calculation requires us to simply count the number of days passed, while determining to which party the time is chargeable, as directed in R.C. 2945.71 and 2945.72." (Internal quotations omitted.) *Crawford* at ¶ 26. Although the formula seems straightforward, cases involving subsequent indictments can be "problematic" with respect to a defendant's speedy-trial rights. *State v. Vasquez*, 10th Dist. Franklin No. 13AP-366, 2014-Ohio-224, ¶ 23.

{¶ 66} Due to the procedural history of the charges against Parker, we must look at several distinct periods to determine whether the state ultimately violated Parker's statutory right to a speedy trial at any point before his jury trial began on October 9, 2018.

23.

## 2.  Parker did not make a prima facie showing that the state was over time before it indicted him in case 4.

{¶ 67} The first step in any statutory-speedy-trial inquiry is a prima facie showing by the defendant that the state brought him to trial outside of the limits imposed by R.C. 2945.71.  We find that Parker failed to make this showing with regard to the period from April 16, 2018—the date of his arrest for the March 25 assault—to July 6, 2018—the date of the indictment in case 4, when a new speedy-trial period began.[3]

{¶ 68} Although the parties dispute whether the addition of new charges canceled Parker's entitlement to triple credit, they agree that he was entitled to triple credit from April 17, 2018 (the day after his arrest, when we begin calculating speedy-trial time) until he was indicted on felony charges related to the October 7 assault.  Thus, to make a prima facie showing that his speedy-trial rights were violated before case 4 was filed, Parker needed to show that case 4 was filed more than 90 days after his arrest on April 16.  He could not do so, however, because April 17 to July 5 was 80 days.  This is within the limit imposed by R.C. 2945.71(C).  Therefore, because Parker did not make a prima facie showing that the state was out of time prior to July 6, 2018, the burden did not shift to the state to justify any delays during this period.

---

[3] Although the parties argue that the date of indictment in case 5—July 11, 2018—is the critical date, felony charges related to the October 7 assault were first filed in case 4 on July 6, 2018.  Because it is the additional charges that change the speedy-trial analysis, we begin our multiple-charge speedy-trial analysis with case 4.

24.

### 3. The speedy-trial clock reset on July 6, 2018.

{¶ 69} On July 6, 2018, when the grand jury issued the indictment in case 4, the speedy-trial clock reset, giving the state an additional 270 days in which to bring Parker to trial. This is because the state is not held to the speedy-trial deadline of the initial indictment when it issues a subsequent indictment that contains new charges if the "additional criminal charges arise from facts different from the original charges, *or* the state did not know of these facts at the time of the initial indictment." (Emphasis added.) *State v. Baker*, 78 Ohio St.3d 108, 676 N.E.2d 883 (1997), syllabus. This test is in the disjunctive, so it is fulfilled if either condition is met. *State v. Smith*, 11th Dist. Ashtabula No. 2004-A-0089, 2006-Ohio-5187, ¶ 29. That is, the speedy-trial clock resets when the state brings new charges based on either (1) facts different from those supporting the original charges or (2) lack of knowledge, at the time the original indictment is filed, of the facts supporting the new charges.

{¶ 70} Here, the state argues that the speedy-trial timetable reset both because it lacked knowledge of the facts supporting the charges related to the October 7 assault at the time it filed the indictment in case 3 and because the charges related to the October 7 assault arose from facts different from the charges related to the March 25 assault.

{¶ 71} The state's claim that it did not know the facts required to charge Parker relative to the October 7 assault at the time it indicted Parker in case 3 is wholly without merit. Generally speaking, for facts to be "unknown" to the state at the time of the original indictment, the facts supporting the new charges must be learned through some

25.

ongoing investigation of the defendant's criminal behavior. *See, e.g., Baker* at 108-109 (speedy-trial time reset when new charges resulted from facts the state learned by auditing pharmacy records obtained following the defendant's arrest for illegally selling prescription drugs to police informants); *State v. Mohamed*, 10th Dist. Franklin No. 08AP-960, 2009-Ohio-6658, ¶ 52 (the results of the laboratory analysis of the suspected drugs seized at the time of the defendant's arrest "constituted a new fact that was not available to the state at the time of the original arrest and/or indictment * * *," so drug charges that were filed after the state received the results were not subject to the same speedy-trial time as the original charges); *compare, e.g., State v. Kasler*, 5th Dist. Fairfield No. 11-CA-59, 2012-Ohio-6073, ¶ 43 (although the state claimed that it did not know the severity of the victim's injuries until the victim returned to Ohio to testify at the defendant's rape trial three years after the defendant was indicted, the new felonious assault charge against the defendant based on the severity of the victim's injuries was not the result of facts unknown to the state at the time of the original indictment where "the State had access to information concerning the potential severity of the injury at the time it occurred and could have inquired of [the victim] about the lingering effects of the injury prior to her appearance at trial."). *See also State v. Parker*, 113 Ohio St.3d 207, 2007-Ohio-1534, 863 N.E.2d 1032, ¶ 19 (Acknowledging that "*Baker* involved subsequent indictments, all of which were the result of the same investigation, but the charges were the direct result of different events on different dates."). The charges in case 4 related to the October 7 assault were not the result of an ongoing investigation;

26.

rather, the state knew (or should have known) all the facts necessary to charge Parker with felonious assault and domestic violence related to the October 7 assault at the time it filed case 3.

{¶ 72} To indict Parker on the felonious assault charge, the state was required to show probable cause that Parker, on October 7, 2017, knowingly caused serious physical harm to J.P. R.C. 2903.11(A)(1). "Serious physical harm" includes physical harm that "carries a substantial risk of death[,]" "involves some temporary, substantial incapacity[,]" or "involves acute pain of such duration as to result in substantial suffering[.]" R.C. 2901.01(A)(5)(b), (c), (e). The domestic violence charge required the state to show probable cause that Parker, on October 7, 2017, knowingly caused physical harm to a family or household member and that he had previously pleaded guilty to or been convicted of two or more domestic violence offenses. R.C. 2919.25(A), (D)(4). "Physical harm" is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A "family or household member" includes someone "who is residing or has resided with the offender * * *" and is "living as a spouse" by "cohabiting with the offender * * *." R.C. 2919.25(F)(1)(a)(i), (2).

{¶ 73} The complaint filed in case 1 shows that the state knew long before July 6, 2018, that J.P. reported to Schaller that Parker, "her live-in-boyfriend, assaulted her by punching her at least three times in the face with a closed fist." The complaint also stated that J.P. was hospitalized with bleeding and swelling in her brain as a result of the attack. The record in case 1 also contains a "Public Safety Assessment" that includes Parker's

criminal record, which notes two prior domestic violence convictions. This information is sufficient to support the grand jury's finding that there was probable cause to believe that Parker committed both felonious assault and domestic violence against J.P. on October 7, 2017.

{¶ 74} The state argued at the hearing on Parker's motion to dismiss that the jail phone calls in which Parker encouraged J.P. not to come to court in October 2017 constituted new facts that reset speedy-trial time when the indictment in case 5 was filed. However, the state did not charge Parker with any crimes related to discouraging J.P. from appearing at court or attempting to get the charges against him dropped, and Parker's coercion of J.P. was not an element of either felonious assault or domestic violence such that the state could not have indicted Parker without knowing about his efforts to prevent J.P. from testifying against him. Thus, we conclude that the information in the phone calls was not a fact unknown to the state, within the meaning of *Baker*, at the time of the indictment in case 3.

{¶ 75} Additionally, the state argued that it was initially unaware of one of Parker's prior domestic violence convictions because his record erroneously listed a 2006 domestic violence case as pending, so the state's later discovery of the conviction was also a new fact that reset the speedy-trial clock. This argument is also unavailing. Although the public safety assessment lists the 2006 case disposition as "PENDING," immediately underneath that the document states "Defendant *sentenced* to 6 months CCNO consecutive. no [sic] costs." (Emphasis added.) So despite the purported

28.

"pending" status of a misdemeanor case that was more than a decade old, Parker's criminal history report clearly shows that he was sentenced to jail for the domestic violence charge in 2006, which would not have happened if Parker had not been convicted. At the hearing, the prosecutor said that a "cursory search" of Parker's record made it appear that Parker did not have a domestic violence conviction in 2006, but acknowledged that the state could have discovered the fact of Parker's 2006 conviction if someone had "look[ed] in to [sic] that case from 2006 * * *."

{¶ 76} In our view, the state's misreading of Parker's criminal history did not make his 2006 domestic violence conviction a new fact, within the meaning of *Baker*, that the state did not know about at the time of the indictment in case 3. Accordingly, we find that speedy-trial time did not reset based on the new charges in case 4 arising from facts unknown to the state at the time it indicted Parker in case 3.

{¶ 77} Regardless, the speedy-trial clock reset on July 6, 2018, because the language in *Baker* is disjunctive, and the other exception applies. That is, the charges related to the October 7 assault arose from facts distinct from the original charges in the indictment in case 3. The "key question" to ask under this exception is "whether all of the offenses at issue arose out of the same set of facts * * *." *Mohamed*, 10th Dist. Franklin No. 08AP-960, 2009-Ohio-6658, at ¶ 32. If they did not, the state is able to take advantage of a new speedy-trial timetable regardless of when it learned of the facts it needed to indict the defendant on the new charges. As the Second District put it, "if the facts of the offenses in multiple indictments are truly different—i .e, [sic] they arise from

29.

different circumstances, require different evidence, and are otherwise distinguishable in a significant way—the State is permitted to charge them separately even if all of the facts are known to the state when the initial indictment is filed." *State v. Jones*, 2d Dist. Montgomery No. 21974, 2008-Ohio-1603, ¶ 10. In this case, it is obvious that the charges related to the October 7 assault arose out of a separate set of facts than the charges related to the March 25 assault; the attacks occurred on different days, consisted of different types of physical assaults on J.P., and resulted in different injuries to J.P. Thus, we conclude that *Baker* applies to the indictment in case 4 and the speedy-trial clock reset on July 6, 2018, giving the state an additional 270 days in which to bring Parker to trial.

### 4. Case 5 was brought to trial in time.

{¶ 78} Initially, we note that the state was subject to the same speedy-trial timeframe in case 5 that applied in case 4 because "'when new and additional charges arise from the same facts as did the original charge and the state knew of such facts at the time of the initial indictment, the time within which trial is to begin on the additional charge is subject to the same statutory limitations period that is applied to the original charge.'" *State v. Freeman*, 6th Dist. Lucas No. L-09-1086, 2010-Ohio-1357, ¶ 42, quoting *Adams*, 43 Ohio St.3d at 68, 538 N.E.2d 1025. The only difference between cases 4 and 5 is the degree of the domestic violence charge; the state needed a second prior conviction to charge Parker with the higher-degree felony in case 5. As discussed above, Parker's second prior domestic violence charge was not "unknown" to the state

30.

before it indicted Parker in case 5, so we find that the state knew the facts of case 5 at the time it indicted Parker in case 4. Accordingly, under *Adams*, the state is held to the same speedy-trial period in case 5 as it was in case 4—the state was required to bring Parker to trial within 270 days of July 6, 2018.

{¶ 79} Before we calculate whether the state brought Parker to trial on time, we must address two discrete time periods. The first is July 11 to October 9, 2018, the time between Parker's indictment in case 5 and the day his trial began. Parker and the state dispute whether Parker's incarceration due to a single indictment that contained charges from unrelated criminal incidents constituted being "held in jail solely on the pending charge." *Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, at ¶ 7. Parker claims that it does, so he is entitled to triple credit for each day he was incarcerated during this period. The state claims that it does not, so he is entitled only to single credit.

{¶ 80} "The triple-count provision of R.C. 2945.71(E) applies to a criminal defendant in jail in lieu of bail and charged with multiple counts under a single indictment, if all counts are to be tried in a single trial." *State v. Collins*, 91 Ohio App.3d 10, 14, 631 N.E.2d 666 (6th Dist.1993); *see also State v. Dankworth*, 172 Ohio App.3d 159, 2007-Ohio-2588, 873 N.E.2d 902, ¶ 37 ("[W]hen an accused is charged with several unrelated offenses in a multiple-count indictment and all counts are to be tried in a single trial, the indictment is treated as a single charge, and the accused is entitled to the triple-count provision."); *State v. Armstrong*, 10th Dist. Franklin No. 87AP-1166, 1989 WL 55700, *3 (May 25, 1989) ("In short, the statutory purpose underlying R.C. 2945.71(E)—the

31.

prevention of undue pretrial detention—is furthered by requiring the state to bring the accused to trial within the statutory period where the accused is detained in lieu of bail on a multiple-count indictment.").

{¶ 81} The state cites to *Parker*, 113 Ohio St.3d 207, 2007-Ohio-1534, 863 N.E.2d 1032, at paragraph one of the syllabus, for the proposition that multiple charges must "arise from a criminal incident and share a common litigation history * * *" to constitute a single charge for purposes of the triple-count provision in R.C. 2945.71(E). However, as the *Dankworth* court explained,

> *Parker* addressed the situation in which multiple related charges were brought separately, and the Ohio Supreme Court concluded, in essence, that the state could not circumvent the triple-count provision by charging the related offenses in separate complaints and addressing them in multiple courts. *Parker* does not address the reverse situation in which multiple unrelated charges are brought in a single multiple-count indictment, as is the case herein, nor does *Parker* suggest that the triple-count provision applies only when factual circumstances similar to Parker's exist.

*Dankworth* at ¶ 38. Because that is the case, we find that Parker was held on a single indictment beginning on July 17, 2018, when cases 3 and 4 were dismissed, so he was entitled to triple credit for each day from July 17 to October 9, when his trial began.

{¶ 82} The second discrete time period that must be accounted for relates to the municipal court complaint for the October 7 assault. When a felony complaint filed in

32.

the municipal court is dismissed and the defendant is later indicted based on the same conduct, the speedy-trial time that elapsed while the municipal court complaint was pending is deducted from the 270 days the state has to bring the defendant to trial on the felony charge. *See State v. Bonarrigo*, 62 Ohio St.2d 7, 11, 402 N.E.2d 530 (1980). The time between the dismissal of the municipal court complaint and the indictment on the felony charge is tolled. *See State v. Azbell*, 112 Ohio St.3d 300, 2006-Ohio-6552, 859 N.E.2d 532, ¶ 16-17, citing *Bonarrigo* at 11 (speedy-trial time is tolled between the time a misdemeanor charge is dismissed and a felony indictment is filed), and *State v. Broughton*, 62 Ohio St.3d 253, 259-260, 581 N.E.2d 541 (1991) (speedy-trial time is tolled between the time a felony indictment is dismissed and a subsequent indictment is filed). Applying this to Parker's case, based on what we can determine from the record, Parker was arrested for the October 7 assault on October 11, 2017, and held in jail until case 1 was dismissed on October 23, 2017. Parker was in jail for 12 days, but because he was being held solely on the charges in case 1, he was entitled to have those days triple counted. So, Parker has a total of 36 additional days of speedy-trial time attributable to case 1 that must be considered in our analysis.

{¶ 83} Turning to the merits of Parker's argument, we must determine whether the state brought Parker to trial within 270 days of July 6, 2018. We calculate Parker's speedy-trial time as follows:

33.

- October 7 assault:

| Dates | Speedy-trial days |
|---|---|
| October 11 to 23, 2017 | 36 (12 days, tripled) |
| July 6 to 16, 2018 | 10 |
| July 17 to October 9, 2018 | 252 (84 days, tripled) |
| **Total days:** | **298** |

- March 25 assault:

| Dates | Speedy-trial days |
|---|---|
| July 6 to 16, 2018 | 10 |
| July 17 to October 9, 2018 | 252 (84 days, tripled) |
| **Total days:** | **262** |

Based on our calculations, Parker made a prima facie showing that his speedy-trial time expired before his trial began regarding the charges related to the October 7 assault, but failed to make a prima facie showing related to the March 25 assault. Thus, the burden shifted to the state to prove that it timely brought Parker to trial on the counts related to the October 7 assault.

{¶ 84} The state met this burden by pointing to tolling events that were sufficient to bring Parker's trial date within the limit in R.C. 2945.71(C). In fact, although there were other tolling events, we will analyze only one event—Parker filing his motion to dismiss—because this event tolled enough time to make Parker's trial timely.

{¶ 85} Parker filed his motion to dismiss on August 20, 2018. This tolled time for a "reasonable time until the motion is responded to and ruled upon." *Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, at ¶ 26; R.C. 2945.72(E). In conjunction with his motion to dismiss—which he filed one day before his jury trial was originally scheduled to begin—Parker asked the trial court to continue the trial. The court granted

34.

his request and continued the case for a hearing on Parker's motion and a jury trial on October 2, 2018. This tolled time until the October 2 court date. R.C. 2945.72(H). The trial court also ruled on Parker's motion to dismiss on October 2. Although we do not have any information about the time constraints on the trial court, considering the circumstances of the case and the complexity of the issues, and the fact that the court reset Parker's case for a jury trial along with a hearing on his motion to dismiss, we find that the delay in ruling on Parker's motion was reasonable. *Crawford*, 6th Dist. Lucas No. L-17-1297, 2019-Ohio-2660, at ¶ 31. Thus, time was tolled from August 20 to October 2, 2018, for a total of 43 days.

{¶ 86} When the days tolled (43) are subtracted from the speedy-trial days elapsed on the October 7 assault charges (298), only 255 days are chargeable to the state, which is well within the 270-day statutory limit. Thus, we conclude that the trial court did not err by denying Parker's motion to dismiss on speedy-trial grounds, and we find that his first assignment of error is not well-taken.

**B. The trial court properly found that J.P. was unavailable to testify at trial.**

{¶ 87} In his second assignment of error, Parker argues that the trial court erred by granting the state's motion for forfeiture by wrongdoing, which allowed the state to introduce at trial hearsay statements that J.P. made to police and medical providers. He contends that Schaller's single attempt to serve J.P. for the October 9, 2018 trial by going to her mother's home at 11:30 p.m. six days before trial and leaving a copy of the

35.

subpoena was insufficient to show that the state made a reasonable, good faith effort to secure J.P.'s appearance at the October 9 trial.

{¶ 88} The state responds that the trial court correctly admitted J.P.'s hearsay statements because the state demonstrated a good faith effort to secure J.P.'s appearance at trial through Schaller's testimony, which showed that (1) J.P. was served with a subpoena for the August 21, 2018 trial date, but failed to appear; (2) Schaller left messages at every phone number he had for J.P. and unsuccessfully attempted to contact J.P.'s mother and brother to try to reach her; (3) Schaller went to J.P.'s home on October 2, 2018, to attempt to serve her with a subpoena for the next day, but was unable to find her; (4) after visiting J.P.'s home, Schaller received a voicemail from J.P. saying that she did not want to be involved in the case and was not going to cooperate; (5) later on October 2, Schaller served J.P. with a subpoena for October 3, but she did not appear; (6) at 11:30 p.m. on October 3, Schaller went to J.P.'s home to serve her with a subpoena for the October 9 trial, but J.P. was not home; and (7) J.P.'s mother told Schaller that J.P. had not been home in three days because she was trying to avoid the police.

{¶ 89} Forfeiture by wrongdoing is an equitable exception to a defendant's constitutional right to confront the witnesses against him. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 96, citing *Giles v. California,* 554 U.S. 353, 366, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), and *Reynolds v. United States,* 98 U.S. 145, 158, 25 L.Ed. 244 (1878). The doctrine is codified in Evid.R. 804(B)(6), which allows the state to use hearsay statements of an unavailable witness against the defendant

36.

if the state can show by a preponderance of the evidence that "(1) the defendant engaged in wrongdoing that caused the witness to be unavailable and (2) one purpose for the wrongdoing was to make the witness unavailable to testify." *Id.*, citing *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 106, and *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 84. The state does not need to establish that the defendant's *sole* purpose was to prevent the witness from testifying; it need only show that the defendant was motivated *in part* by a desire to prevent the witness from appearing in court. *Hand* at ¶ 90.

{¶ 90} A witness is considered "unavailable" if she "is absent from the hearing * * *" and the state "has been unable to procure the [witness's] attendance * * * by process or other reasonable means." Evid.R. 804(A)(5). This involves a showing that the state made reasonable, good faith efforts to secure the witness's attendance at trial. *State v. Keairns*, 9 Ohio St.3d 228, 230, 460 N.E.2d 245 (1984). The state's efforts should be "diligent," but if an investigator's attempts to locate a subpoenaed witness fail, the witness can be considered unavailable. *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶ 67 (2d Dist.). The state has the burden of proving both that the witness is unavailable and that it made reasonable, good faith efforts to secure the witness's attendance. *Keairns* at 232; *Ohio v. Roberts*, 448 U.S. 56, 74-75, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *abrogated in part on other grounds by Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

37.

{¶ 91} Given that a ruling on the admission of hearsay under Evid.R. 804(B)(6) implicates a defendant's Confrontation Clause rights, we review the issue de novo. *State v. Harper*, 2017-Ohio-1395, 89 N.E.3d 141, ¶ 15 (6th Dist.), citing *McKelton* at ¶ 97.

{¶ 92} Here, Parker does not argue that the state failed to prove that his wrongdoing resulted in J.P.'s unavailability for trial on October 9 or that he had the purpose of preventing J.P. from coming to trial. Instead, he argues that the state did not make a sufficient showing that J.P. was unavailable on October 9, 2018 (as opposed to earlier trial dates). Parker points out that the only effort the state made to secure J.P.'s attendance at the October 9 trial was Schaller's failed attempt to serve J.P. with a subpoena at 11:30 p.m. on October 3—six days before the trial—when he learned that J.P. had not been to her mother's home in three days because she was avoiding the police. Parker claims that the state did nothing from October 4 to October 9 to ensure that J.P. would be available to testify against him. In response, the state points to all of its efforts prior to October 4 and to J.P.'s history of failing to come to court and avoiding communication with prosecutors and Schaller.

{¶ 93} Parker likens this case to *State v. Wolderufael*, 10th Dist. Franklin No. 02AP-1148, 2003-Ohio-3817, in which the Tenth District found that the state failed to prove that its witness—who was attending college out of state and could not be served with a subpoena—was unavailable for trial because the state did not present evidence that it took *any* steps to secure the witness's attendance at trial. *Id.* at ¶ 29-30 ("Despite the absence of the subpoena power, the state could have made reasonable efforts to secure

38.

[the witness's] presence at trial. At the very least, the state could have informed [the witness] of the date and location of the trial and asked that he attend. As there is no evidence that the state took this step or any other step to seek [the witness's] presence, he was not unavailable for purposes of the Confrontation Clause or Evid.R. 804."). We disagree with this comparison.

{¶ 94} In this case, the state went to great effort to get J.P. to testify at Parker's trial. Schaller left messages for her at every phone number he had for her, spoke to her relatives, and visited her home to try to reach her. J.P. was actually served with two subpoenas and failed to appear for those court dates. She also failed to attend a meeting with the prosecutor to which she had been subpoenaed. Despite being ordered to appear, J.P. made it clear to the court, the prosecutors, and Schaller that she did not want to be involved with the case, did not intend to cooperate with the prosecution of the case, and would not come to court. Additionally, when Schaller spoke to J.P.'s mother on October 3, he learned that J.P. was avoiding the police so that she could not be served with another subpoena. We have found that similar efforts by the police to find a reluctant witness were sufficient to meet the state's burden under Evid.R. 804. *Harper*, 2017-Ohio-1395, 89 N.E.3d 141, at ¶ 24-26.

{¶ 95} In short, this is not a case, like *Wolderufael*, where the state did nothing to get its witness to trial. Although the state could have conceivably done more after October 3 to try to get J.P. to come to court for the October 9 jury trial, all evidence indicates that the state's efforts would have been futile, and "[t]he law does not require

39.

the doing of a futile act." *Roberts*, 448 U.S. at 74, 100 S.Ct. 2531, 65 L.Ed.2d 597.

Moreover, there is no requirement that the state make every possible effort before the

court can declare a witness unavailable under Evid.R. 804; the state is only required to

make reasonable efforts. Evid.R. 804(A)(5); *Keairns*, 9 Ohio St.3d at 230, 460 N.E.2d

245.

{¶ 96} Because the state proved by a preponderance of the evidence that J.P. was

unavailable for trial, the trial court properly granted the state's motion for forfeiture by

wrongdoing. Parker's second assignment of error is not well-taken.

### C. The trial court did not abuse its discretion by denying Parker's motion for a mistrial.

{¶ 97} In his final assignment of error, Parker argues that the trial court erred by

denying his motion for a mistrial based on a juror's comment that Parker "must be in

custody * * *." He claims that it was error for the court to individually voir dire the

jurors before hearing counsel's arguments for a mistrial and that by doing so, the court

"placed an unnecessary focus on the fact that [Parker] may have been in custody at the

time of the trial" and gave the jurors curative instructions without defense counsel's

input. The state responds that the trial court was within its discretion to deny the mistrial

because a single comment regarding Parker's custody status did not deprive Parker of his

right to a fair trial.

{¶ 98} Granting or denying a mistrial rests in the sound discretion of the trial court

because the trial judge is in the best position to determine if the situation in the courtroom

warrants a mistrial. *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988). Accordingly, we review the trial court's decision for an abuse of discretion. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996).

{¶ 99} A mistrial should not be ordered "'merely because some error or irregularity has intervened * * *.'" *Treesh* at 480, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). Instead, a mistrial is necessary only when a fair trial is no longer possible. *Id.*, citing *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

{¶ 100} Here, we agree with the state that the passing comment made by a juror on her way out of the courthouse did not warrant a mistrial. The comment about Parker being in custody was brief, and the conversation was quickly stopped by another juror. Contrary to Parker's belief, there is no indication in the record that the court's individual voir dire of the jurors to determine what they heard in the elevator and whether it affected their ability to remain impartial "placed an unnecessary focus on the fact that [Parker] may have been in custody at the time of the trial." Even if it did, each juror said that they could remain impartial, would continue to hold the state to its burden of proof, and understood that whether or not Parker was in custody had no bearing on the determination the jury was asked to make in this case. There is nothing here that demonstrates that Parker could not receive a fair trial after someone commented in the

elevator as the jurors were leaving for the day that "'I think the defendant must be in custody then because he comes from the back.'"

{¶ 101} In a somewhat similar case, *State v. Conley*, 5th Dist. Richland No. 2009-CA-19, 2009-Ohio-2903, ¶ 8, a witness mentioned that the defendant was in custody at the time his bedroom was searched. The trial court overruled the defendant's motion for a mistrial, finding that it was reasonable for the jury to presume that the defendant was in custody on the underlying case. *Id.* The court also gave the jury a curative instruction informing them that they could not consider the fact that the defendant may or may not have been in custody as evidence in the case. *Id.* at ¶ 28-29. The Fifth District found that the trial court did not abuse its discretion by denying the defendant's motion for a mistrial because the witness's passing comment, when considered in light of the circumstances in which it was made and its possible effect on the jury, "was not so prejudicial that an impartial verdict could not be reached." *Id.* at ¶ 28.

{¶ 102} The same is the case here. Given the nature of the comment and the evidence of Parker's custody status that was necessarily introduced later in the trial, it is highly unlikely that the comment in the elevator prejudiced Parker. Each of the jurors who recalled hearing the comments said that what they heard would not affect their ability to be fair and impartial in the case. The trial judge also instructed each juror who recalled the comments to disregard them because whether or not Parker was in custody had no bearing on the juror's determination of Parker's guilt or innocence. Jurors are presumed to follow the court's instructions, including instructions to disregard things

42.

they have heard. *See Treesh*, 90 Ohio St.3d at 480, 739 N.E.2d 749, citing *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994), and *State v. Zuern*, 32 Ohio St.3d 56, 61, 512 N.E.2d 585 (1987). And a judge's admonition to the jury that it cannot consider the fact that a defendant is in custody precludes the defendant from establishing that a comment about his custody status prejudiced him. *See State v. Norvett*, 10th Dist. Franklin Nos. 11AP-215 and 11AP-223, 2011-Ohio-6563, ¶ 29 (Trial judge's statement to jurors that "'I think some of you may have come to the conclusion that the Defendants are in custody'" was not prejudicial because the judge also admonished the jury that it could not consider the fact that the defendants were in custody.).

{¶ 103} Further, not long after the individual voir dire, the state introduced recordings of phone calls Parker made to J.P. from the jail. The calls were authenticated by a Lucas County sheriff's deputy who was responsible for monitoring the jail's telephone system. The deputy specifically testified that "[a]ny time someone is in our custody their [sic] is a process through which they are able to use the telephone. Those calls are recorded and it's our ordinary business to monitor calls [and] if they're requested by the prosecutors, detectives, we're the ones who would make copy [sic] of those phone calls for everyone." She also explained that she had run reports related to Parker, and the calls played for the jury were calls that had come from those reports. Although the state was careful not to refer to the calls as "jail calls" or draw any unnecessary attention to Parker's custody status, it was impossible to completely avoid bringing Parker's custody status into the trial.

43.

**{¶ 104}** Because the jurors were inevitably going to learn that Parker had been in jail, we do not believe that the trial court abused its discretion by concluding that a juror's passing comment about Parker being in custody did not prejudice Parker's substantial rights or deprive him of the possibility of having a fair trial. Parker's third assignment of error is not well-taken.

### III. Conclusion

**{¶ 105}** Based on the foregoing, the October 31, 2018 judgment of the Lucas County Court of Common Pleas is affirmed. Parker is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____

_____
JUDGE

Christine E. Mayle, J. _____
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.